In re CENTER TELEPRODUCTIONS, INC., d/b/a Megamedia Center, Debtor.

DANA COMMERCIAL CREDIT CORPORATION, Plaintiff,

v.

Alan NISSELSON, as Trustee in Bankruptcy for Center Teleproductions, Inc., and in his individual capacity, Greyhound Financial Corp., First Bank National Association, successor in interest to Commercial Funding, Inc., and G.E.M. Auction Corp., Defendants.

Bankruptcy No. 89–B–10552 (HCB).

Adv. No. 89–6593A.

United States Bankruptcy Court, S.D. New York.

March 29, 1990.

Hunton & Williams, by Deborah L. Fletcher and Myron D. Cohen, New York City, for Dana Commercial Credit Corp.

Brauner Baron Rosenzweig Kligler Sparber Bauman & Klein, by Howard L. Simon, New York City, for Alan Nisselson and G.E.M. Auction Corp.

Boyle, Vogeler & Haimes, by Michael J. Levin and David C. Wrobel, New York City, for Greyhound Financial Corp.

Dorsey & Whitney, by Kim A. Anderson, Minneapolis, Minn., for First Bank Nat. Ass'n.

## DECISION AND ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

The instant motion to dismiss or for summary judgment brings to the fore consideration of the scope of the liability and immunity of bankruptcy trustees and the auctioneers they hire.

In its complaint, Plaintiff Dana Commercial Credit Corporation ("Dana") alleges to have consented to an auction sale (the "Auction") by Defendant Alan Nisselson, Trustee for Center Teleproductions, Inc., the Debtor herein, of certain property of the estate in which Dana held security interests, on condition that it receive not less than $182,475 of the Auction proceeds. The Auction having been confirmed by the Court, and it appearing that the Trustee contends that Dana may be entitled to an amount less than $182,475, Dana seeks, *inter alia*, (1) to impose personal liability upon the Trustee for damages allegedly suffered as a result of his allegedly negligent acts in effecting the sale of property in which Dana held security interests, his allegedly negligent inducement of Dana's consent to confirmation, and his allegedly negligent or willful implementation of the order confirming the Auction, in violation of fiduciary and statutory duties; (2) to impose personal liability upon Defendant G.E.M. Auction Corp. ("G.E.M."), agent of the Trustee, for damages allegedly suffered as a result of G.E.M.'s allegedly negligent acts in auctioning the same property; and (3) to hold the Trustee accountable for property of the estate in which Dana held a security interest, which property might have been stolen from the Debtor's premises.

The Trustee and G.E.M. filed the instant motion for dismissal of the above counts for failure to state a claim upon which

relief may be granted, pursuant to FED. BANKR.R. 7012 and FED.R.CIV.P. 12, or, in the alternative, for summary judgment in accordance with FED.BANKR.R. 7056 and FED.R.CIV.P. 56.[1]

Because in this circuit, a cause of action imposing personal liability upon a trustee appointed in accordance with Section 1104 of the United States Code, 11 U.S.C. § 101 et seq. (the "Code"), or upon the trustee's agent, will lie for acts negligently or willfully performed in the violation of some lawful duty, that branch of the motion seeking dismissal must be denied. Because there remains a plethora of genuine issues of material fact to be tried, as discussed herein, that branch seeking summary judgment must also be denied.

### I

The following facts are not disputed, except where indicated. Center Teleproductions, Inc. ("Center") was a New York-based television production studio. Prior to Center's filing a petition for reorganization under Chapter 11 of the Code on March 22, 1989, Dana entered into a master lease agreement (the "Agreement"), Complaint, Exhibit 1, with Center on or about November 20, 1988. By the Agreement, Dana purported to lease to Center certain computer hardware and software and office equipment and furniture (the "Leased Equipment"). Presumably to protect itself from claims that the Agreement was truly a financing agreement, see e.g., NYNEX BISC v. Beker Industries Corp. (In re Beker Industries Corp.), 69 B.R. 937 (Bankr.S.D.N.Y.1987), Dana filed several financing statements to perfect security interests in the Leased Equipment. Complaint, Exhibit 2.[2]

In late May of 1989, Fred Granger III, portfolio manager of Dana, inspected Center's premises and tagged each item of Leased Equipment, including items described as "Grass Valley Editing Systems." Granger Affid., ¶ 4.

Subsequently, at a hearing on the Trustee's motion for an order extending the time to assume or reject the Debtor's lease with respect to its premises, the Court ordered that the premises and so much of the Debtor's equipment as determined by the Trustee be sold at a public auction commencing August 22, 1989. Nisselson Affid., ¶ 6. G.E.M. was authorized to appraise and sell property of the estate by order of the Court on August 16, 1989, nunc pro tunc as of July 27, 1989. Id., ¶ 8. The property was comprised of thousands of pieces of highly technical and electronic equipment. 9/6/89 Hrg.Tr., p. 10. Pursuant to the Trustee's instructions, G.E.M. employees inspected the equipment at the Debtor's premises. With the assistance of Edward Train, an officer of Center, and relying on the Debtor's books and records, they prepared a listing of each item of equipment with the party secured thereby by lot number. Nisselson Affid., ¶ 9; Moneypenny Affid., ¶¶ 5–6. G.E.M. claims that this listing was made available to all secured parties "well in advance of the Auction." Id., ¶ 6.

The Trustee then prepared and served on all creditors, including Dana, a document entitled "Notice of Auction of Video Production Studio Equipment, Furniture, Automobile and Lease" (the "Notice"). Nisselson Affid., ¶ 10; Motion Exhibit B. The Notice listed the property to be sold at the Auction in general terms and stated that Center's premises were to be open for inspection of that property 9 a.m. to 5 p.m. beginning August 1, 1989 through August 22, 1989, the date of the Auction. Nisselson Affid., ¶ 11, Motion Exhibit B. Nisselson alleges to have personally contacted Dana and all other secured creditors of the

---

1. They also seek an order in interpleader permitting the Trustee to deposit with the Court the proceeds of the Auction which are the subject of competing claims by Dana, Greyhound Financial Corp. and First Bank National Association and to disburse to the Trustee and G.E.M. commissions allocable to the funds sought to be interpleaded.

2. By order of the Court on June 22, 1989, Alan Nisselson was appointed Chapter 11 Trustee in accordance with § 1104(c) of the Code. Upon the joint motion of the United States Trustee and the Trustee, the case was converted to a case under Chapter 7 of the Code on October 16, 1989. Nisselson currently serves as Chapter 7 Trustee.

Debtor whose collateral were to be sold at the Auction to inform them of the opportunity to, *inter alia*, inspect their collateral. Nisselson Affid., ¶ 12. Dana, apparently because it had tagged the Leased Equipment in May, did not, before or at the Auction, inspect the premises to verify that the Leased Equipment remained there and were properly identified as its collateral or property. Nisselson Affid., ¶¶ 13–14, Complaint, ¶ 30.

Prior to the Auction, Dana filed an objection to the sale of its Leased Equipment at the Auction on the ground that because the Agreement was a true lease, the Leased Equipment was not property of the estate which the Trustee had authority to sell. By motion, Dana also sought to compel the Trustee to assume or reject the Agreement. In his response, the Trustee argued that the Agreement was an agreement to purchase, and not a true lease, and therefore, he could sell the Leased Equipment free and clear of Dana's security interest. Originally returnable before the Auction, the matter was set over by the Court to September 6, 1989, the scheduled date of the hearing on confirmation of the Auction.

It is asserted that by letter of August 1, 1989, the Trustee stated his position on the true lease issue and that, notwithstanding Dana's contentions, the Trustee required, "in order to determine the minimum upset price at the auction," Dana's calculation of the amount due under the Agreement as of the petition date and the total amount of financing outstanding. Complaint, ¶ 20. On August 21, 1989, Dana allegedly responded by telecopy that of the $316,554.95 due under the Agreement, $90,000 was secured by a letter of credit, leaving the "total payoff" of $226,554.95. Complaint, ¶ 21.

The Trustee and G.E.M. conducted the Auction on August 22 and August 23, 1989, subject to approval of the Court. The Trustee informed Dana by telecopy on August 31, 1989 that bids in the amount of $182,475 had been received for the Leased Equipment and enclosed a list stating:

| LOT | DESCRIPTION | MARG | BID |
|---|---|---|---|
| 210 | Grass Valley # 300 Switcher w/Lot # 213 GVG Comp. | DANA | $42500.00 |
| 232 | MacIntosh SE PC S# FA44B96M501 | DANA | 1250.00 |
| 233 | Apple Printer S# 0696494 | DANA | 600.00 |
| 777 | MacIntosh Laser Writer II S/N CA841AN9 | DANA | 3100.00 |
| 777A | MacIntosh Computer SE | DANA | 1900.00 |
| 978 | MacIntosh 11X Comp. w/Keyboard S# 5825 | DANA | 3600.00 |
| 979 | Tallgrass Power Supply MG–T4000T | DANA | 300.00 |
| 980 | MacIntosh Plus SE Comp. w/Keyboard and Mouse S# 5010 | DANA | 1000.00 |
| 981 | MacIntosh SE 2–800 Disc Drive S# F8448JMM5100 | DANA | 1800.00 |
| 982 | MacIntosh SE 2–800 Disc Drive S# F844CR9M5010 | DANA | 1500.00 |
| 983 | MacIntosh SE S# F844TM1010 | DANA | 1500.00 |
| 984 | MacIntosh SE 2–800 Disc Drive S# F844G9KM No Mouse | DANA | 1500.00 |
| 985 | MacIntosh SE 2–800 Disc Drive S# F844TM5010 | DANA | 1600.00 |
| 986 | Apple Image Writer X S# 1700738 | DANA | 450.00 |
| 987 | MacIntosh SE w/Keyboard S# 845HMVM0001A | DANA | 1600.00 |
| 988 | MacIntosh Plus w/Keyboard S# 845LOCM0001A | DANA | 1100.00 |
| 988A | MacIntosh PC Plus w/o Keyboard and Mouse S# F844H09M | DANA | 900.00 |
| 989 | MacIntosh SE Comp. S# F8448KMM | DANA | –0– |
| 990 | Amdek Computer w/Monitor and Disk Drive | DANA | 175.00 |
| 1032 | Grass Valley Generator | DANA | 1100.00 |

**572**

| LOT | DESCRIPTION | MARG | BID |
|---|---|---|---|
| 1033 | Grass Valley 300 Editing System (6 components) | DANA | 55000.00 |
| 1034 | Grass Valley Editing System (6 components) | DANA | 60000.00 |
| 1035 | Zaxcom Video TBC Hub 1000 Control Router S/NO1911 | DANA | –0– |
| | | | $182475.00 |

Complaint, ¶ 24. It is alleged that no other information respecting any other property sold at the Auction was provided by the Trustee to Dana. *Id.*

Greyhound Financial Corp. ("Greyhound"), another secured creditor, was apparently also provided a listing, similar to that provided Dana, concerning its collateral. By letter dated August 31, 1989, Greyhound informed Nisselson that it consented to the auction sale of property that the Trustee, in schedules provided to Greyhound, indicated were subject to Greyhound's lien and to deduction of reasonable fees under § 506(c) of the Code. Greyhound Answer, Exhibit A; Wrobel Affid., Exhibit A.

In addition, Greyhound asserted that Lots 210, 1033 and 1034, comprised of Grass Valley equipment that had commanded bids of $157,500 at the Auction, were improperly designated as subject to Dana's lien and belonged to Greyhound. *Id.* Other lots were alleged in the letter to have been similarly misdesignated as subject to the liens of other secured creditors. *Id.* Greyhound asserted its security interest in all those misdesignated lots and consented to the sale for the bid prices, subject only to claims under § 506(c). *Id.*

A hearing to confirm the Auction and on Dana's motion to compel the Trustee to assume or reject the Agreement was held on September 6, 1989. In preparation for the hearing, G.E.M. had compiled a list (the "Schedule") of the equipment sold, the parties having security interests therein, the prices bid and the lot numbers. Moneypenny Affid., ¶ 12. Apparently, this Schedule consisted of all the listings that Nisselson provided Dana, Greyhound, and other secured creditors after the Auction. The Trustee is alleged to have circulated, imme-

diately before the hearing at the courthouse, a proposed order of confirmation with the Schedule annexed. Tarkenton Affid., ¶¶ 11–12; Moneypenny Affid., ¶ 12.

Greyhound's attorney, Michael Levin, alleges that, at that time, he informed Granger, Jeffrey Tarkenton, one of Dana's attorneys, and the Trustee that Lots 210, 1033 and 1034 were misidentified as subject to Dana's lien and were in fact subject to Greyhound's lien. Greyhound Answer, ¶ 34; Wrobel Affid., ¶ 5; Nisselson Affid., ¶¶ 19–20; Complaint, ¶ 28; Granger Affid., ¶ 14; Tarkenton Affid., ¶ 14. Levin allegedly further informed Granger that some of Dana's property might have been stolen from Center's premises. Tarkenton Affid., ¶ 14; Greyhound Answer, ¶ 10. Thus, Tarkenton thought that the alleged discrepancy could be explained by the burglary Levin referred to and Dana would receive the sum promised. Tarkenton Affid., ¶ 17. The complaint, ¶¶ 13–14, alleges that it was not explicitly stated by any party that Dana would not receive $182,475 less expenses. Granger claims that the Trustee and G.E.M. assured him at the hearing that the property was properly identified in the Exhibit attached to the proposed order of confirmation, that the Leased Equipment had commanded bids of $182,475, and that any dispute regarding the identification of property could be resolved after the hearing without prejudice to any party. Granger Affid., ¶¶ 15–16; Schiemer Affid., p. 1.

It is alleged that based on those representations, the apparent consent of Greyhound to Dana's receipt of $182,475 of the proceeds, the understanding that Dana would receive at least $182,475 of the Auction proceeds, and the belief that insurance proceeds would cover losses in the event any of the Leased Equipment had been stolen, Dana consented to confirmation of

the Auction and withdrew its motion to compel assumption or rejection of the Agreement. Complaint, ¶ 32; Granger Affid., ¶ 16.

The transcript of the September 6, 1989 hearing reveals the following:

Mr. Nisselson: ... In any event, the auction was held. The results of the auction are that $1,447,381.50 of proceeds were bid. That sum is insufficient to cover the secured debt. However, the following parties have agreed to an auction sale on two conditions, which I will enumerate for the Court. Greyhound, which holds or which equals $1,123,-996.50 of equipment proceeds with one caveat, I'll have to explain that, Your Honor; Dana, which is $182,475; First Bank, which is $100,950 and Heller Financial, which equals $27,460.

The Court: What was the name?

Mr. Nisselson: Heller Financial, $27,460.

The Court: What are these allocations, this is their equipment sold for these sums, is that it?

Mr. Nisselson: Yes, with one caveat which I have to explain to the Court in a few minutes. They have all agreed to an auction sale on two conditions.

\* \* \* \* \* \*

Mr. Nisselson: ... The one caveat I mentioned with respect to allocation of the proceeds of sale is as follows. Greyhound Financial has asserted a secured claim to some of the equipment held as secured or which is covered by Dana security, by First Bank security and by Heller security. These parties have all been informed of Greyhound's claim. We are trying to resolve that.

9/6/89 Hrg. Tr., pp. 6–8.

The proposed order, which the Trustee circulated at the hearing (the "Confirmation Order"), directing the sale in accordance with the Schedule annexed, was signed on September 6, 1989.

Immediately after the hearing, Granger visited Center's premises to investigate the allegations of misidentification. Granger Affid., ¶ 17. He observed that the tags he placed on the Leased Equipment in May remained in place. Granger Affid., ¶ 18. He confirmed that Lots 210, 1033 and 1034 designated in the Schedule as subject to Dana's lien were in fact subject to Greyhound's. Granger Affid., ¶ 19. In addition, he determined that the following Grass Valley items were erroneously listed on the Schedule as subject to Greyhound's lien when they were in fact subject to Dana's lien:

| LOT | DESCRIPTION | MARG | BID |
|-----|-------------|------|-----|
| 157 | Grass Valley Edit System 2 Kybds. 1 Console 5 # 424 | GREY | $16,000 |
| 288 | Grass Valley Edit System Console w/Lot 1012 | GREY | 15,000 |
| 336 | Lot of Grass Valley GRP (3 Keybds Edit Sys 40602) | GREY | 17,000 |
| 1070 | Grass Valley 8451 Interface GP w/Lot 336 | GREY | –0– |
| 1071 | Grass Valley 8465 PREVE Switcher w/Lot 336 | GREY | –0– |

*Id.*, Complaint, ¶ 35. Granger also learned that Lot 29, comprised of a Grass Valley Editing System Keyboard and Jogger in which Dana held a security interest and which commanded a bid of $12,000 at the Auction, was misdesignated as subject to the security interest of Commercial Funding, Inc. ("CFund"), predecessor in interest of Defendant First Bank National Association. Complaint, ¶ 36.

On September 6, 7, and 8, 1989, Granger notified a G.E.M. employee that with certain property sold at the Auction having been misidentified and the Schedule being incorrect, none of the property should be released to purchasers until the errors were corrected. Complaint, ¶ 38; Granger Affid., ¶¶ 19, 21, 23. It appears, however, that by the morning of September 6th or 7th, Paul Schiemer, a bidder at the Auction,

had the numerous items on which he had successfully bid segregated at a staging area on the main studio floor. Schiemer Affid., p. 1. Loading of the equipment that Schiemer had purchased, including property subject to Dana's liens, commenced on the same date. *Id.*

On September 7th or 8th, Tarkenton notified Nisselson that Dana revoked its consent since it was based on receipt of an amount not less than $182,475. Complaint, ¶ 39; Tarkenton Affid., ¶ 18. Tarkenton further stated to Nisselson that Court approval and Dana's consent was based on the Trustee's representation of facts as set forth in the Schedule and that the Schedule, being materially incorrect, rendered the Confirmation Order invalid. Complaint, ¶ 39.

By letter dated September 8, 1989, the Trustee responded that Dana failed to raise the issue in a timely manner, that one piece of equipment claimed by Dana had already been transferred to the buyer and that he intended to consummate the sale "as directed by Confirmation Order." Nisselson Affid., ¶ 25. He alleges to have thereafter suggested verbally more than once that Dana should move for an injunction since he had been threatened with suit by a purchaser and would not forestall consummation. *Id.* at ¶ 26.

On September 11th or 12th, Center's premises were burglarized and certain property was stolen. Moneypenny Affid., ¶ 15. While the record indicates those items reported stolen, Moneypenny Affid., Exhibit A, it is not clear to whom the property belonged. The premises and equipment, however, were insured and insurance claims have allegedly been filed by the Trustee. Moneypenny Affid., ¶ 15. It is asserted, and not disputed by Dana, that if any of the Leased Equipment were stolen, Dana will recover insurance proceeds therefor. *Id.;* Rule 13(h) Statement, ¶ 29.

By letter to Nisselson dated September 13, 1989, Dana threatened to enjoin consummation of the sale. Nisselson Affid., ¶ 27; Motion, Exhibit F. Dana failed to do so until September 19, 1989. Nisselson Affid., ¶ 31. The Trustee proceeded to complete the sale. *Id.,* ¶ 28. On Dana's motion to enjoin the sale and to vacate the Confirmation Order, Nisselson objected on the ground that Dana consented to the sale. Nisselson Affid., ¶ 31. The Court did not reach those issues, finding the motion procedurally defective in that the purchasers were necessary parties, but were not joined and did not receive notice. The Court further ruled that an adversary proceeding was required under Rule 7001 of the Bankruptcy Rules to settle this dispute.

On November 17, 1989, the Court ordered the Trustee to disburse all proceeds of the Auction to secured creditors and fees to the Trustee and G.E.M., except the following which the Trustee continues to hold for the following parties in an interest bearing escrow account:

| | | |
|---|---|---|
| Dana | $ 23,075 | (1.6%) |
| First Bank/Dana | 12,000 | ( .8%) |
| First Bank/Greyhound | 43,120 | (3.0%) |
| Greyhound/Heller | 41,585 | (3.0%) |
| Greyhound/Dana | 205,500 | (14.0%) |

and Trustee's and auctioneer's fees allocable to those proceeds. Motion, Exhibit G.

## II

In this adversary proceeding, Dana asserts that the Trustee and auctioneer are personally liable for failing to exercise due care and diligence in carrying out fiduciary duties and duties under § 704(1), (2) and § 363(f)(2), in misidentifying property, misquoting bids and thereby inducing Dana's consent to the sale of property either owned by it or standing as its collateral, and in releasing goods despite actual knowledge of its misidentification and revocation of consent. Dana Opposition, pp. 7–9, 14. Dana also contends that the Trustee, upon learning of the misidentification on September 6, 1989, or earlier, had an affirmative duty to act to prevent damage to Dana and to consult with the Court. He should not have proceeded to consummate the sale, knowing that Dana would not receive the amount upon which it based its consent and it being illogical to conclude that Dana would have consented to sale of its collateral for less than $182,475. Dana Opposition, pp. 12–13. Dana concedes that a bankruptcy trustee may derive immunity

from appointment by the court, but argues that such immunity is not absolute and is not applicable where a trustee negligently procures a court order and a creditor's consent thereto.

In support of dismissal, the Trustee argues that there is no claim that he has breached his duties under § 704(1) or § 704(2) of the Code or any other statutory duty. Accordingly, he claims that he and the auctioneer are immune from liability for performance of his official duties under the supervision of and with approval of the Court. Memo., p. 4. For the Trustee, this immunity would extend, according to him, to "each and every act of the Trustee in connection with the liquidation of the Debtor's estate ... made under the supervision of this Court and ... authorized and/or approved by an order of the Court," Memo., p. 5, including hiring G.E.M., selling estate assets to the highest bidders subject to confirmation, investigating and reporting, and obtaining the Confirmation Order. Memo., pp. 5–7.

The Trustee contends that granting the relief sought by Dana would impose upon a trustee the obligation to guarantee accuracy of its statements regarding secured parties' interests from a debtor's books and records where a secured creditor is in a better position to provide that accuracy. Since Dana had the opportunity to verify the identification, but failed to do so, the Trustee argues that Dana's damages stemmed from its own negligence for which the Trustee cannot be accountable. *Id.*

The Trustee also contends that since Dana knew at the hearing that the Grass Valley "big ticket" items were claimed to be subject to Greyhound's lien, 2/2/90 Letter, it must have known that, if those items were determined to be Greyhound's collateral, Dana's portion of the Auction proceeds would be significantly less then $182,475. Memo., pp. 7–8. It is argued that Dana, therefore, waived its right to object to confirmation and is estopped from attacking the Confirmation Order. *Id.*

Since the Confirmation Order confirms the sale of equipment listed on the Exhibit for the prices indicated and that order has not been appealed or vacated, the Trustee contends that the order is final and binding and that the acts of the Trustee or G.E.M. in connection with the sale cannot be re-litigated. Memo., p. 9.

Finally, the Trustee points out that Dana does not claim that he was negligent in maintaining any property of Dana which may be found to have been stolen. Memo., p. 11. Nisselson argues, and Dana does not dispute, that Center's premises were insured and secured by an alarm system, and appropriate insurance claims were filed with respect to the stolen equipment. *Id.*

### III

### *Motion to Dismiss*

#### A

A motion for dismissal pursuant to FED. R.CIV.P. 12(b)(6), tests only whether the factual allegations of a complaint plead a cause of action cognizable under applicable law. The factual allegations of the complaint are, therefore, presumed to be true and all reasonable inferences are to be drawn in favor of the plaintiff. *E.g., Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957). Generally, a complaint may be dismissed only if its claims are unquestionably insufficient to entitle the plaintiff to relief regardless of the supporting facts that may be proven at trial. *Dopico v. Goldschmidt*, 687 F.2d 644, 649 (2d Cir.1982); *Duncan v. AT & T Communications, Inc.*, 668 F.Supp. 232, 234 (S.D.N.Y.1987). Even where it is clear from the face of the pleadings that recovery is remote, a complaint will withstand a motion to dismiss so long as the alleged facts set forth a legally sufficient cause of action. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

#### B

█ It is beyond cavil that public officials, judges, and court officials are absolutely immune from common law tort liability actions, for acts taken within the scope of their official duties. *E.g., Weissman v.*

*Hassett*, 47 B.R. 462, 466 (S.D.N.Y.1985), *citing, Stump v. Sparkman*, 435 U.S. 349, 356–57, 98 S.Ct. 1099, 1104–05, 55 L.Ed.2d 331 (1978) and *Barr v. Matteo*, 360 U.S. 564, 569–74, 79 S.Ct. 1335, 1338–41, 3 L.Ed.2d 1434 (1959). Bankruptcy trustees, as quasi-judicial officials, derive qualified immunity with respect to the exercise of business judgment under lawful authority. *Weissman*, 47 B.R. at 466; *c.f., Bradford Audio Corp. v. Pious*, 392 F.2d 67, 73 (2d Cir.1968) (court appointed receivers are quasi-judicial officers within the protection of immunity when carrying out court orders). But that immunity is only partial; a bankruptcy trustee may be held liable for negligent or willful acts in carrying out his statutory or other duties. *Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951); *In re Gorski*, 766 F.2d 723, 727 (2d Cir.1985), *citing, Hall and Baldrian v. Perry (In re Cochise College Park, Inc.)*, 703 F.2d 1339, 1357 (9th Cir.1983).

In the seminal *Mosser* case, the Supreme Court held a reorganization trustee personally liable for expressly agreeing with two employees of the debtor that they could trade extensively in securities of the debtor's subsidiaries. *Mosser*, 341 U.S. at 268–75, 71 S.Ct. at 680–84. The arrangement yielded substantial profits for the employees. Notwithstanding that the trustee did not personally benefit, liability attached, not for "failure to detect defalcations, in which case negligence might be required to surcharge the trustee" but for the willful and deliberate establishment in the employees of an interest adverse to that of the estate. *Id.* at 272, 71 S.Ct. at 682. In *dictum*, the Court stated that "[c]ourts are quite likely to protect trustees against heavy liabilities for disinterested mistakes in business judgment," and that trustees could avoid personal liability by seeking guidance from the court in difficult circumstances and by accounting at prompt intervals. *Id.* at 274–75, 71 S.Ct. at 683.

(i)

### *Liability of a Trustee*

■ *Mosser* has spawned two distinct positions regarding trustee immunity from personal liability for negligence. *See In re*

*Tucker Freight Lines, Inc.*, 62 B.R. 213, 217 (Bankr.W.D.Mich.1986) (brief discussion of divergent authorities). In *In re Johnson*, 518 F.2d 246 (10th Cir.), *cert. denied sub nom. Clark v. Johnson*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975), the Tenth Circuit initially held that *Mosser* established that the standard applicable to the surcharge of a bankruptcy trustee is negligence. That Court later ruled, in *Sherr v. Winkler*, 552 F.2d 1367 (10th Cir.1977), that *Mosser* established that a bankruptcy trustee is (a) not liable in any manner, for mistake in judgment where discretion is allowed, (b) liable personally only for acts determined to be willful and deliberate in violation of his duties, and (c) liable, in his official capacity for acts of negligence. The Fourth and Sixth Circuits have adopted the *Sherr* Court's interpretation of *Mosser*. *Yadkin Valley Bank and Trust Co. v. McGee*, 819 F.2d 74 (4th Cir.1987); *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451 (6th Cir.1982); *United States, Etc. v. Sapp (In re Southern Foundation Corporation)*, 641 F.2d 182 (4th Cir.1981).

The Second and Ninth Circuits have not followed suit. In *Gorski*, 766 F.2d 723, a Chapter XIII trustee under the former Bankruptcy Act failed to compel Chapter XIII joint debtors to make payments pursuant to a plan for thirty three months. The Chapter XIII trustee was held personally liable for the negligent breach of his fiduciary duties to the estate. Although the former Bankruptcy Act did not expressly provide that the trustee was to oversee compliance with a plan, that duty was held to be an inherent obligation and failure to carry it out gave rise to liability for negligence. *Gorski*, 766 F.2d at 726.

In so holding, the Second Circuit relied on *Cochise*, 703 F.2d 1339, where the Ninth Circuit ruled:

> A bankruptcy or reorganization trustee is a fiduciary of each creditor of the estate ... As such, he has a duty to treat all creditors fairly and to exercise that measure of care and diligence that an ordinarily prudent person under similar circumstances would exercise ... Al-

though a trustee is not liable in any manner for mistake of judgment where discretion is allowed, ... he is subject to personal liability for not only intentional but also negligent violations of duties imposed upon him by law ...

*Cochise*, 703 F.2d at 1357 (citations omitted).

In so ruling, the *Cochise* Court explained *Mosser*'s pronouncement that for failure by a trustee to detect defalcations, negligence might be required to surcharge the trustee. 703 F.2d at 1357–58 n. 26. By that statement, the Supreme Court intended not to impose strict liability on bankruptcy trustees. *Id.* Furthermore, since surcharge is the imposition of personal liability on a fiduciary for willful or negligent misconduct in the administration of his fiduciary duties, the *Cochise* Court ruled that *Sherr* was incorrect in construing *Mosser* to mean that personal liability does not obtain if a showing of negligence is made. *Id.*

Thus, the *Cochise* Court held that a Chapter X trustee under the former Bankruptcy Act would be held personally liable if, on remand, it was found that the trustee acted negligently, and not as a matter of discretion, in failing to timely reject certain executory contracts or that the trustee made fraudulent or negligent misrepresentations to non-bankrupt parties to executory contracts. 703 F.2d 1339, 1357–60. Given the *Gorski* Court's unqualified reliance on *Cochise*, this appears to be the rule in the Second Circuit and is to be followed here.

Subsequently, the Ninth Circuit, in *Bennett v. Williams*, 892 F.2d 822 (9th Cir. 1989), confirmed *Cochise*, but limited it in holding that a bankruptcy trustee would be immune from a claim of failure to supervise constantly a management agency, hired without opposition from plaintiffs and with court approval, that acted negligently. The Court ruled that a trustee is not liable for failing to constantly supervise its agent and stated that the plaintiffs should seek recourse against the management agency for negligence. In so ruling, the Court joined a position long established. *See In re Breger Kosher Sausage Co.*, 129 F.2d 62 (7th Cir.1942); *Evans v. Williams*, 276 F. 650, 657 (6th Cir.1921), *cert denied, Williams v. Evans*, 258 U.S. 618, 42 S.Ct. 272, 66 L.Ed. 793 (1922); *Speight v. Gaunt*, [1883] 22 Ch. 727 ("when according to the usual and regular course of business, ... and without any misconduct or default on the part of the Trustee, a loss takes place, through any fraud or neglect of the agents employed, the Trustees are not liable to make good such loss.") [3] Thus, that rule should apply in the Second Circuit and is followed here. Although it could be argued that making trustees accountable for all acts of their agents would promote effective estate administration, a standard focusing on the trustee's own negligence also serves that salutary goal and promotes the additional goal of encouraging able and prudent persons to serve as trustees without the Damoclean sword of absolute liability hanging over their heads.

Distinct from the *Gorski/Cochise* and *Sherr* lines of cases are such cases as *Boullion v. McClanahan*, 639 F.2d 213 (5th Cir.1981) and *Bradford Audio*, 392 F.2d 67, where a trustee (*Boullion*) or receiver (*Bradford Audio*) is not alleged to have negligently procured a court order, but has merely acted within his authority and the court has confirmed his acts. In such cases, the remedy is to appeal, not to collaterally attack the order. Thus, in *Boullion*, the Fifth Circuit held that joint debtors, alleging harm by a bankruptcy trustee's acts taken in the course of his duties, and confirmed by court order, may not collaterally attack those orders by bringing an action for personal liability against the trustee. There, the debtors sued a bankruptcy trustee for breach of

---

**3.** In contrast stands *Carson, Pirie, Scott & Co. v. Turner*, 61 F.2d 693 (6th Cir.1932). There it was held that a trustee is liable where, without the trustee's negligence or knowledge, an auctioneer he had engaged, appropriated estate proceeds to his own use. Since the Supreme Court's decision in *Mosser, Carson* can no longer be viewed as good law. The *Mosser* Court refused to adopt the position that a trustee should be liable in all events for the acts of his agents. Rather, the Court focused on negligence and knowledge. 341 U.S. at 272, 71 S.Ct. at 682.

fiduciary duties in (1) recommending an inexperienced appraiser; (2) allowing the filing of an incorrect appraisal; (3) improperly handling sales of the estate property; and (4) failing to surrender disclaimed and exempt assets. The trustee was held immune from tort actions since he acted under the supervision and subject to the orders of the bankruptcy judge. The Court stated that the proper recourse was not an independent action against the trustee, but appeal of the orders as a matter of right. 639 F.2d at 214, *citing, Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (holding that collateral estoppel applied to actions brought under Civil Rights Act of 1871 and encompass civil or criminal court decisions or judgments). *See also, Chaitman v. FIFA,* No. 85-C-6363, slip op., 1986 WL 5012 (N.D.Ill. April 22, 1986) (LEXIS, Bkrtcy library, Cases file).

Similarly, in *Bradford Audio,* where the district court ordered the appointment of a receiver and property seized, the court, in dismissing an action against the receiver for seizing the property, ruled: "a court-appointed receiver doing no more and no less than to carry out an explicit order, fair and regular on its face ... [is] immune from liability to the appellant for taking into his possession [the property]." 392 F.2d at 72–73. *See also Mullis v. U.S. Bankruptcy Court for the District of Nevada,* 828 F.2d 1385, 1390–91 (9th Cir.1987), *cert. denied and appeal dismissed,* 486 U.S. 1040, 108 S.Ct. 2031, 100 L.Ed.2d 616 (1988) (holding that a bankruptcy judge and trustee acting pursuant to court order are immune for deprivation of constitutional rights unless their acts are in clear absence of all jurisdiction).[4]

Thus, the rules to be drawn from these cases are that, in this circuit, a bankruptcy trustee is immune from suit for personal liability for acts taken as a matter of business judgment in acting in accordance with statutory or other duty or pursuant to court order. Where the trustee negligently fails to discover his agent's negligence, negligently obtains a court order, or negligently or willfully carries out a court order he knew or should have known he wrongfully procured, however, personal liability will attach.

(ii)

### *Liability of an Auctioneer*

■ The Trustee and auctioneer advance no reasons why the liability of an auctioneer engaged by a bankruptcy trustee pursuant to court order should be any different, with the exception that a trustee will not be liable for failure to constantly supervise the auctioneer. Analogy may be drawn from cases concerning the liability of a court-appointed receiver. The rule in this circuit is that a court-appointed receiver doing no more and no less than to carry out explicit orders of the court is immune from liability. *Bradford Audio,* 392 F.2d at 73–74; *See also, Kermit Constr. Corp. v. Banco Credito Y. Ahorro Ponceno,* 547 F.2d 1 (1st Cir.1976) (holding that a receiver who faithfully and carefully carries out orders of the appointing judge shares the judge's absolute immunity). As stated in *Bradford Audio,* "a receiver obeying the orders of the court is not a guarantor of the correctness of the court's rulings." 392 F.2d at 73, *quoting* 2 Clark, *Receivers* § 388 (3d ed. 1959). Conversely, immunity will not extend to a court-appointed auctioneer who negligently performs tasks

---

**4.** In *Weissman,* the District Court cited *Mosser* for the proposition that a trustee is not immune from suits for torts "committed in conducting the business affairs of the bankrupt company." 47 B.R. 462, 466. The *Weissman* Court relied on *Boullion,* however, for the proposition that a trustee is immune when acting to conserve the bankrupt's estate. *Id.* Holding that a trustee's investigating and allegedly libelous reporting is in no way related to the ongoing operation of the business, but rather constituted assembling the estate, the Court found the trustee immune from action for libel, intentional infliction of emotional distress and intentional interference with the plaintiffs' business relationship. *Id.* The Court also barred suit because the report constituted privileged statements in judicial proceedings under New York law. 47 B.R. at 468–69. Since *Gorski* would deny immunity for negligent or willful acts violating some lawful duty, *Weissman* might best be viewed as an exception under the judicial proceedings privilege.

necessary to implement a court order or tasks assigned to him by the Trustee.

### C

██ It is apparent that, under applicable standards for dismissal, Dana's complaint in this case withstands the motion to dismiss. It being alleged, and indeed undisputed, that Lots 210, 1033, 1034, 157, 288, 336, 1070, 1071 and 29 were misidentified in the Schedule, a cause of action lies against the Trustee and G.E.M. for negligently selling Lots 157, 288, 336, 1070, 1071 and 29 without compliance with § 363(f) of the Bankruptcy Code, 11 U.S.C. § 363(f) (1986), and for negligently `obtaining Dana's consent to the sale of its property or collateral on the basis that it would receive $182,475 in violation of the same provision and the Trustee's fiduciary duty to Dana in the disposition of the Leased Equipment.[5]

Key to this case is § 363(f) of the Code. That section governs sale of estate property that collateralize a lien. 2 K. Klee, R. Levin, J. Lewittes, H. Miller, P. Murphy, J. Samet, and W. Stern, *Collier on Bankruptcy* ¶ 363.07 (15th ed. 1989). It provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

No subsection other than § 363(f)(2) has been alleged as the statutory predicate for the order confirming the sale in this case. It plainly applies to Dana's collateral. Notwithstanding the contention that the Agreement was a true lease, Dana had also perfected its security interests in the Leased Equipment. Dana, therefore, had an interest in property the Trustee sought to sell at the Auction. Under § 363(f), the Trustee's ability to sell that property free and clear of Dana's interest was limited. Accordingly, the Trustee obtained Dana's

---

**5.** In *In re Nadler,* 8 B.R. 330 (Bankr.E.D.Pa. 1980), the Court observed that

[s]ecured creditors, as well as unsecured creditors, may be the intended beneficiaries of the trustee's performance of his fiduciary duties and thus may seek to recover damages for breach of those obligations. This rule applies to both the duty to liquidate expeditiously and distribute assets of the estate, and the related obligation to preserve the value of all estate assets. The trustee, as fiduciary, represents all creditors of the bankrupt, secured and unsecured. However, the trustee "primarily represents the unsecured creditors and represents the secured creditors only in his capacity as a custodian of the property upon which they have a lien."

8 B.R. at 333 (citations omitted). The Trustee's alleged breach of fiduciary duty owing to Dana by failure to exercise due diligence in disposing of the Leased Equipment, however, adds nothing to our analysis of his liability in negligently obtaining Dana's consent. The Trustee's custodianship duties are put in issue only with respect to the Leased Equipment that may have been stolen. That issue is discussed in Part IV(C) *infra.*

Dana's additional contention that the Trustee is liable for violating § 704(1) or (2) is without merit. Section 704 provides in relevant part: The Trustee shall—

(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest;

(2) be accountable for all property received;

. . .

At all relevant times, the Trustee was acting as a Chapter 11 trustee. A Chapter 11 trustee's duties are set forth in § 1106(a)(1). That section does not incorporate § 704(1). Although § 704(2) does apply in Chapter 11 cases, *see,* § 1106(a)(1), it more properly addresses the trustee's duty to, for *e.g.,* account for interest from interest bearing accounts, to file a report or running summary of details of administration, or to maintain accounts dealing in dollars and cents. 4 R. D'Agostino, M. Cook, R. Mabey, A. Pedlar, and B. Zaretsky, *Collier on Bankruptcy* ¶ 704.5 (15th ed. 1989). Dana does not truly contend violations of such duties.

consent to the sale of the Leased Equipment in order to procure the order confirming the sale.

The complaint here can be said to broadly charge the Trustee and the auctioneer with selling certain of Dana's collateral or property without compliance with § 363(f), with improperly obtaining Dana's consent through negligently representing that Dana's collateral would be sold for $182,475 and with knowingly or negligently implementing the Confirmation Order notwithstanding the knowledge that Dana's consent, a necessary predicate to that order, had been wrongfully obtained.

With respect to non-compliance with § 363(f), we need not be long detained. The Trustee has advanced no reason why compliance with § 363(f) was not required with respect to Dana's collateral which had been erroneously scheduled as belonging to Greyhound and CFund.

As to the misrepresentation charge, it is settled that a bankruptcy trustee may be liable for negligent misrepresentation to a creditor that induces justifiable reliance by the creditor if applicable state law so provides. *Cochise*, 703 F.2d at 1359.[6]

Nor should immunity, obtained through following a court order, bar such a claim, at least where it is alleged that the order relied on was obtained by virtue of the misrepresentation. The Supreme Court said as much in *Mosser* where it observed, in addressing a trustee's claim that the employment of persons trading for their own account in securities held by a trust for which the trustee had been appointed reorganization trustee:

If their services were so indispensable that an arrangement so highly irregular was of advantage to the trust, this might have been fully disclosed to the court and the creditors cited to show cause why it should not have been openly authorized. Instead of this, the trustee, although he did discuss with Judge Holly the employment of Kulp and Miss Johnson, did not disclose the critical fact that he was employing them on terms which permitted their trading in the underlying securities. Indeed, it appears that he did not even disclose this feature of the transaction to his own counsel. It is hardly probable that a candid disclosure to creditors, to the court, and to interested parties would have resulted in instructions to have pursued this course; but, had it been authorized, at least the assenting creditors might have found themselves estopped to question the transaction.

341 U.S. at 274, 71 S.Ct. at 683.[7] The Second Circuit echoed this reasoning in *Bradford* in immunizing a receiver for merely following the command of an order "fair and regular on its face." 392 F.2d at 72–73. An order procured by misrepresentation actionable under state law can hardly be so categorized.

It is precisely this kind of circumstance where a trustee discovers an error or questionable circumstance that *Mosser*, 341 U.S. at 274–75, 71 S.Ct. at 683, addresses. He should return to the court, on appropriate notice to all affected creditors to avoid or minimize harm which might arise through implementation of a wrongfully procured order.

Moreover, in light of § 363(m) of the Bankruptcy Code,[8] it is clear that an appeal

---

6. The Trustee does not address whether such a cause of action lies under New York law. In New York, it is well settled that liability lies for negligent misrepresentation at least where there is knowledge or its equivalent that the information misrepresented is desired by the person to whom it is given for a serious purpose and intends to rely on it and there was conduct linking the speaker with that person which evinces the speaker's understanding of that reliance. *See e.g., Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985); *White v. Guarente,* 43 N.Y.2d 356, 372 N.E.2d 315, 401 N.Y.S.2d 474 (1977); *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139 (1931); *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275, 23 A.L.R. 1425 (1922).

7. Similarly, an *ex parte* order does not immunize a trustee from claims of those who had no knowledge or notice of it, *Cochise,* 703 F.2d at 1357 n. 25, since they could not appeal and therefore could not be said to be collaterally attacking the order.

8. Section 363(m) of the Code provides:

from the order confirming the sale would have been futile, since the sale would have stood [9] and Dana have lost its rights in the Leased Equipment and been left with recourse against the proceeds of the sale of its property.

Furthermore, it seems from the affidavit of one of the purchasers (Schiemer Affid.), that, when the Confirmation Order was signed, the sale had progressed to the point where, by reason of payment, delivery, or segregation of property, the purchasers may have obtained the status of bona fide purchasers.[10] The Court said as much on Dana's motion to vacate the order, heard on September 19, 1989, in its ruling that the purchasers were necessary parties. For that additional reason, appeal would likely have been futile.

For all these reasons, the Trustee's argument under *Boullion*, 639 F.2d 213, that Dana should have enjoined consummation of sales pursuant to the Confirmation Order, therefore, is of little or no merit. This case is not a collateral attack on an order. Rather, as pleaded in the complaint, it is a case of consent to an order obtained by a trustee's negligence. The motion to dismiss must, therefore, be denied.

## IV

### *Summary Judgment*

In accordance with FED.R.CIV.P. 56, made applicable to bankruptcy proceedings by FED.BANKR.R. 7056, a party to an adversary proceeding is entitled to summary judgment as a matter of law if the pleadings, depositions, admissions, affidavits, and other items of the record indicate that there is no genuine issue as to any material fact.[11] Further, there must be a showing by the moving party that it is entitled to judgment as a matter of law. 10 C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure:* Civil 2d § 2711 (1983).

Upon the movant's identification of those portions of the record which it believes demonstrates to the Court the absence of any genuine issue of material fact, the party opposing the motion must come forth with evidentiary material, aside from the mere pleadings, which demonstrate that a trial is necessary to determine the material fact or facts at issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 272 (1986). Where it appears that reasonable minds could differ as to the import of evidence, trial is required and summary judgment should not be granted. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986). In interpreting the facts, all of the evidence and the inferences that may be drawn therefrom must be viewed in the light most favorable to the party opposing the motion for summary judgment. *See Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 553 (1986); *Tel-*

---

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. 11 U.S.C. § 363(m) (1986).

9. *E.g., Willemain v. Kivitz (In re Willemain),* 764 F.2d 1019 (4th Cir.1985) (where the debtor failed to secure a stay of a sale pending appeal and interest in estate property was sold to a good-faith purchaser, the debtor's appeal of the sale was held moot).

10. The parties do not discuss the issue of when a sale to a bona fide purchaser becomes so completed that it cannot be reversed. Under N.Y.U.C.C. § 2–401 (McKinney 1962), unless otherwise explicitly agreed, title to goods passes to the buyer at the time and place at which the seller completes his performance with respect to the physical delivery of the goods, but in any event, not prior to the identification of such goods. *See also* 50 N.Y.Jur. *Sales* § 63 (1st Ed. & Supp.1989)

11. The Trustee and G.E.M. seek dismissal under FED.R.CIV.P. 12(b)(6) or, in the alternative, summary judgment. The motion to dismiss principally raises the immunity issue discussed above in light of the pleadings. The motion for summary judgment raises the issue of whether there is a triable issue of fact in light of the applicable law.

*edyne Industries Inc. v. Eon Corp.*, 373 F.Supp. 191, 196 (S.D.N.Y.1974).

Here, there is a plethora of disputed facts concerning the main branches of Dana's complaint. There is, however, as set forth, *infra*, no genuine dispute concerning Dana's claim that the Trustee is personally liable for the burglarized collateral.

## A

### *Auctioneer Liability*

■ The auctioneer's liability to Dana for the Trustee's having sold certain equipment without complying with § 363(f) and obtained Dana's consent to the sale Confirmation Order is seemingly governed largely by the issues of whether the auctioneer acted with the due care required, Dana's reliance on the Schedule prepared by the auctioneer in light of all the facts, and the amount of damages incurred. There seems to be no dispute regarding whether G.E.M. and Dana had the requisite relationship required by New York law to make G.E.M. liable in negligence.

As noted, *supra* n. 6, liability in New York for negligent misrepresentation in a report depends on three prerequisites:

> (1) The [reporting party] must have been aware that the report [was] to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the [reporting party] linking [it] to that party or parties, which evinces the [reporting party's] understanding of that party or parties' reliance.[12]

*Credit Alliance Corp. v. Arthur Anderson & Co.*, 65 N.Y.2d 536, 551, 483 N.E.2d 110, 118, 493 N.Y.S.2d 435, 443 (1985). Thus in *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275, 23 A.L.R. 1425 (1922), where, upon request of a seller of beans, public weighers furnished negligently prepared certificates of the weight of beans reciting that the certificates were ordered by the seller for use by the buyer, and the buyer, provided a duplicate copy of those certificates by the weighers, paid the seller an amount based on those certificates, the weighers were held liable in negligence to the buyer for the amount overpaid. The Court ruled that in such circumstances,

> [t]he plaintiffs' use of the certificates was not an indirect or collateral consequence of the action of the weighers. It was a consequence which, to the weighers' knowledge was the end and aim of the transaction ... [A]ssumption of the weighing was the assumption of a duty to weigh carefully for the benefit of all whose conduct was to be governed. We do not need to state the duty in terms of contract or of privity. Growing out of a contract, it has none the less an origin not exclusively contractual. Given the contract and the relation, the duty is imposed by law ... 233 N.Y. at 238–39, 135 N.E. at 275–76, 23 A.L.R. at 1426–27 (citations omitted).

Here, the affidavit of Robert Moneypenny, vice-president of G.E.M., establishes that he was aware that most of the debtor's property was subject to security interests (¶ 5), that a listing prepared by G.E.M., including the identity of the secured party with respect to each lot, was "provided to the Trustee and made available to all secured parties well in advance of the Auction" (¶ 6) and, that "in preparation for the confirmation hearing, [Moneypenny] prepared a listing of the property sold at the Auction which now included the price bid for each lot [which] listing was made available to all secured parties and was made an exhibit to the proposed order confirming sale" (¶ 12). It is this Schedule that incorrectly listed the Grass Valley "big ticket" items of lots 210, 1033, and 1034 as Dana's collateral and incorrectly listed lots 157,

---

**12.** Although this test was formulated in terms of accountant's liability, it has its roots in *Glanzer v. Shepard*, a nonaccounting case, and is "intended to preserve" the principles set forth by Judge Cardozo, in *Glanzer* and *Ultramares* and subsequently by the New York Court of Appeals in *White v. Guarente. Credit Alliance Corp.*, 65 N.Y.2d at 551, 483 N.E.2d at 118, 493 N.Y.S.2d at 443.

288, 336, 1070, 1071 and 29 as part of Greyhound's and CFund's collateral when, in fact, they were Dana's collateral.

In his affidavit, Granger states that both the Trustee and G.E.M., apparently at the September 6, 1989 hearing, "assured me that the equipment was correctly identified on the Trustee's schedules, part of which had been telecopied to [Dana's attorney] on August 31, 1989 and which were attached to the Order entered by this Court on September 6, 1989." Granger Affid., ¶ 15. The Trustee denies giving such assurances with respect to the "big ticket" items. The hearing transcript evidences that the Trustee revealed in open court that Greyhound claimed an interest in "some of the equipment held as secured or which is covered by Dana security," and others' security. Hrg.Tr., p. 8. Both the Trustee and Greyhound assert that Levin, counsel to Greyhound, informed Granger of Greyhound's claims to the "big ticket" items. Greyhound Answer, ¶ 34, Wrobel Affid., ¶ 5, Nisselson Affid., ¶¶ 19–20. Dana and Greyhound also allege that Levin informed Dana that some of its collateral may have been stolen from Center's premises. Complaint, ¶ 28, Tarkenton Affid., ¶ 14, Greyhound Answer, ¶ 10. But the Trustee, G.E.M. and Greyhound make no claim of having informed Dana of the misidentification of Lots 157, 288, 366, 1070, 1071 and 29 listed as part of Greyhound's and CFund's collateral.

It is thus plain that G.E.M. is not entitled to summary judgment on these claims. It is established that G.E.M. knew that the Schedule it prepared was to be sent to Dana. It appears undisputed, and G.E.M. does not deny, that it knew, in preparing the Schedule that Dana and other secured parties would use and rely on it for the purpose of accepting the dollar amount bid for their individual pieces of collateral and

there was conduct linking G.E.M. and Dana evincing Dana's reliance on the Schedule.

It remains disputed what was said by the Trustee and Levin to Dana on September 6 regarding the "big ticket" items of Lots 210, 1033, and 1034 and whether Dana could, in light of what was said, could rely on the Schedule with respect to those lots. Trial must be held on those issues. It is apparently undisputed that nothing was said regarding the other lots.[13]

Also to be tried is the issue of the auctioneer's due care. G.E.M. contends that it could rely on a representative of the Debtor and the Debtor's books and records. The condition of the Debtor's books and records is not stated. Dana contends that each item of its collateral was marked by it in May 1989 and that the markings were in place on September 6, 1989. Whether that is so and, if so, whether G.E.M. could rely on the Debtor's books and records in light of those markings are triable issues of fact.

### B

#### Trustee's Liability

■ The issues regarding the Trustee's liability include those concerning the auctioneer's liability to the extent that his liability depends on proof of the auctioneer's actionable negligence. But his ultimate liability depends on proof of the Trustee's own negligence. With respect to the Schedule,[14] that issue has at least two components: (1) whether the Trustee, although excused from constant supervision under *Bennett*, was negligent in relying on G.E.M.'s Schedule; and (2) whether the Trustee, in light of Levin's letter of August 31, 1989 informing him that Greyhound asserted a claim to the "big ticket" items and other pieces of equipment said to be collateral for other secured creditors, was negligent in not causing a re-examination of the entire Schedule and thereby learning that Lots 157, 288, 336, 1070, 1071, and 29, incorrectly ascribed to Greyhound and

---

**13.** There also may be an issue of whether Dana could reasonably rely on the Schedule in giving its consent to the sale pursuant to § 363(f)(2). The Trustee and G.E.M. contend that Dana should have inspected its collateral after the auction but before the sale was confirmed.

Whether that is so in light of Dana's having marked its collateral in May 1989 is disputed.

**14.** By all accounts, the Trustee moved expeditiously to sell a large amount of highly technical equipment. But, the Schedule prepared by the auctioneer was erroneous.

CFund, belonged to Dana. Also triable is whether the Trustee or Dana could have stopped consummation of the sale in light of § 363(m) and the possibility that bona fide purchasers had vested rights, as noted above.

## C

■ With respect to count three of the Complaint regarding the Trustee's liability for burglarized equipment, it is settled that the breadth of a trustee's fiduciary duty extends to secured creditors and he is therefore obligated to exercise due care in the preservation and custody of secured creditors' collateral. *Nadler*, 8 B.R. at 330. Here, there is no allegation that the Trustee was negligent in securing Center's premises or in the physical maintenance of the Leased Equipment. Nor does Dana dispute the Trustee's assertion, Rule 13(h) Statement, ¶ 29, Moneypenny Affid., ¶ 15, that if any of the Leased Equipment was stolen from Center's premises, insurance proceeds would compensate Dana for any resulting loss. Although the record does not reveal whether any of the stolen property was subject to Dana's security interests, summary judgment on count three of the complaint must issue in favor of the Trustee in light of that undisputed assertion and Dana's failure to raise a triable issue of fact. *See Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

Accordingly, the motion to dismiss must be and hereby is denied and the motion for summary judgment for the Trustee and the auctioneer must be and hereby is granted on count three and is otherwise denied.[15] It is

SO ORDERED.

---

**15.** The Trustee currently holds $325,280. Motion, Exhibit G. Defendant Greyhound claims it is entitled to $157,500 of $205,500 allocated to it and Dana. Greyhound Ans., ¶ 51. Dana claims $182,475 of the same $205,500. Complaint, p. 25. Although the fact that the stakeholder may be independently liable to a claimant may no longer preclude relief in an interpleader action, *see* FED.R.CIV.P. 22(1); *Stuyvesant Ins. Co. v. Dean Constr. Co.*, 254 F.Supp. 102, 109 (S.D.N.Y. 1966), *aff'd per curiam sub nom Stuyvesant Ins. Co. v. Kelly*, 382 F.2d 991 (2d Cir.1967); 7 C. Wright and A. Miller, *Federal Practice and Procedure:* Civil 2d § 1706 (1983), the Trustee's request for leave to interplead the balance of the Auction proceeds cannot now be granted. The parties have failed to adequately brief the issues in light of the fact that the Trustee and auctioneer seek fees allocable to the $182,475 of the Auction proceeds that Dana claims.